**The PEOPLE of the State of Colorado, Plaintiff–Appellee**

v.

**Shannon Dillon BERRY, Defendant–Appellant.**

**No. 09CA2543.**

Colorado Court of Appeals, Div. VII.

Oct. 13, 2011.

Rehearing Denied Jan. 19, 2012.

John W. Suthers, Attorney General, Carmen Moraleda, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Jane Hazen PC, Jane Hazen, Denver, Colorado, for Defendant–Appellant.

Opinion by Judge CRISWELL.*

Defendant, Shannon Dillon Berry, appeals from his judgment of conviction of retaliation against a judge. The conviction was based upon statements he allegedly made to a mental health evaluator who was called in to consult with him regarding possible mental or emotional problems at a hospital emergency room. On appeal, he contends that the district court erroneously construed the pertinent statute, section 18–8–615(1)(b)(II)(B), C.R.S.2011, not to require proof that he knew the mental health evaluator was under a duty to report his statements to the judge. We agree with Berry's interpretation of the statute as requiring knowledge of the reporting person's duty to report. And, applying that interpretation, we conclude that the evidence was insufficient to support his conviction. Hence, we reverse Berry's conviction without

---

* Sitting by assignment of the Chief Justice under provisions of the Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2011.

passing on his constitutional assertion, that, given the circumstances under which they were made, his statements were protected by the First Amendment.

## I. Background

Berry had recently been divorced before the incident at issue in this case occurred. A few months after the judge in his case had entered the final decree, Berry asked a friend to drive him to the emergency room at the local hospital. Once there, Berry initially told one of the nurses that he would kill someone if he were to be released from the hospital. A mental health evaluator then saw him. Berry told this evaluator that he had been thinking about hurting several persons, including his ex-wife, her attorney, and the judge who had presided over his divorce case. The evaluator contacted Berry's mother and ex-wife, and based on what they said, later told Berry they thought he was making these statements only because Berry was drunk. Berry said that he also had these thoughts when he was sober. He told the evaluator that his ex-wife was "stupid" to think that he "wouldn't do anything."

Based on these statements, the evaluator concluded that Berry was an imminent danger to himself and others, and therefore, she concluded that she had a duty to inform his purported targets about his statements.[1] She testified that she generally tells patients of her duty to report before they make any threatening statements, but that she does not initially inform her emergency patients, like Berry, of such duty. The record, then, is clear that, before making his statements to her, the evaluator did not inform Berry that she was under a duty to report any threats he made.

The evaluator committed Berry on an emergency basis because he was under the influence of alcohol and because she concluded that he was both suicidal and homicidal. She also contacted Berry's ex-wife and the police department to warn them of Berry's threats. She told the police that they should contact the ex-wife's attorney and the judge to warn them, as well.

The police later informed the judge of the statements that Berry had made about her. They then arrested Berry, at which time he told the investigating police officer that he had "just said [that he] wanted to kill the three of them, and [that he] was not actually going to kill them." He added that "if [he had] really wanted to kill anybody, it would have already been done."

Berry was charged with and convicted of retaliating against a judge pursuant to section 18–8–615, C.R.S.2011.

## II. The Proper Interpretation of the Statute

The pertinent provisions of the statute under which Berry was convicted, section 18–8–615, read as follows:

> An individual commits *retaliation* against a judge by means of a *credible threat* ... if the individual *knowingly* makes the credible threat:
>
> (I) Directly to the judge; or
>
> (II) To another person:
>
>> (A) If the individual intended that the communication would be relayed to the judge; or
>>
>> (B) If the other person *is required* by statute or ethical rule *to report* the communication to the judge.

§ 18–8–615(1)(b), C.R.S.2011 (emphasis added). Such a credible threat must be made "as retaliation or retribution against a judge." § 18–8–615(1)(a), C.R.S.2011.

Berry argues that the statute's requirement that the actor "knowingly" make a credible threat means that, if the threat is made to a person who is required to report the threat to the judge, the actor must know that that person has such a duty. We agree.

Statutory interpretation is a legal question that we review de novo. *People v. Coleby*, 34 P.3d 422, 423 (Colo.2001).

---

**1.** Section 13–21–117, C.R.S.2011, provides that, when a mental health patient communicates to a mental health professional "a serious threat of imminent physical violence against a specific person or persons," that mental health profes-sional must warn such potential targets by notifying them of that threat and notifying the appropriate law enforcement agency as well, "or by taking other appropriate action including, but not limited to, hospitalizing the patient."

In considering this issue, we must observe certain rules of statutory construction. First, when interpreting a statute, we strive to give effect to the intent of the legislature. *People v. Hickman*, 988 P.2d 628, 634 (Colo. 1999). To accomplish this goal, we begin by giving the statute's words and phrases their plain meanings. *People v. McIntier*, 134 P.3d 467, 472 (Colo.App.2005). Only if we conclude that the language itself is ambiguous may we look to other sources to ascertain legislative intent, including the legislature's stated objective, the circumstances surrounding its enactment of the provision, and the consequences of a particular interpretation. *Hickman*, 988 P.2d at 634.

Second, we must read and consider the statute as a whole and give consistent and harmonious meaning to its various parts. *McIntier*, 134 P.3d at 472. "In doing so, a court should not interpret a statute in ways that defeat the legislature's obvious intent, or render part of the statute either meaningless or absurd." *Id.*

■ And last, in the specific context of mens rea, we must determine whether the legislature intended that any express or implied culpable mental state applies to all, or only some, of the crime's elements. *People v. Cross*, 127 P.3d 71, 74 (Colo.2006). "The mens rea of a statute may speak to conduct, or to circumstances, or to result, or to any combination thereof, but not necessarily to all three." *Id.* However, when the General Assembly has expressly adopted a mens rea element in the statute, we look to section 18–1–503(4), C.R.S.2011. That provision states that "[w]hen a statute defining an offense prescribes as an element thereof a specified culpable mental state, that mental state is deemed to apply to every element of the offense unless an intent to limit its application clearly appears." *Id.*

■ With these principles in mind, we first note, that, to be a "credible threat," the threat must be one "that would cause a reasonable person to be in fear for the person's safety." § 18–8–615(1)(a) (adopting definition set forth in stalking statute, § 18–3–602(2)(b), C.R.S.2011). To constitute such a threat, then, the person threatened must become aware of the threat. A reasonable person would not be placed in fear for his or her safety unless that person becomes aware of the threat.

The retaliation statute fully recognizes this. It establishes three ways in which a "credible threat" may be made, and each assures that the judge will become aware of the threat.

First, the individual may make the threat "[d]irectly to the judge...." § 18–8–615(1)(b)(I).

Second, the threat may be made to another person, providing the "individual [making the threat] intended that the communication would be relayed to the judge...." § 18–8–615(1)(b)(II)(A).

Third, the communication may be made to another person who "is required ... to report the communication to the judge." § 18–8–615(1)(b)(II)(B).

■ It seems reasonably clear from the face of the statute that, to "knowingly make[ ] the credible threat" directly to the judge, the speaker must know that the person to whom the communication is made is a judge. If such a communication is made without knowledge that the person spoken to is a judge, it could hardly be said that the speaker "knowingly" made a threat "[d]irectly to the judge."[2] § 18–8–615(1)(b)(I).

■ Likewise, the face of the statute makes clear that, when the threat is made to another person who is not under any duty to report it to a judge, the statute is violated only if the speaker "intends" for that other person to relay it to a judge. § 18–8–615(1)(b)(II)(A). Lacking proof of such specific intent, a threat made to such other person does not violate the statute.

The first two ways in which a judge may become aware of the threat, therefore, are clearly subject to an express mens rea requirement—the threat made directly to the

---

**2.** We do not address the question whether, where the individual mistakenly believes a communication is made to a judge, that communication could constitute an "attempt" to retaliate against a judge.

judge must be made knowingly, and the statement made to a person not under any duty to report the threat must be made with the specific intent that the other person inform the judge of the threat.

While section 18–8–615(1)(b) contains the general requirement that the speaker act "knowingly," and while section 18–8–615(1)(b)(II)(A) expressly requires intentional action, there is no further reference to any mens rea requirement in section 18–8–615(1)(b)(II)(B) itself, the provision at issue here.

At the same time, nothing in this latter provision suggests that the General Assembly did not intend for a mens rea requirement to apply to this method of committing the offense. *See Coleby,* 34 P.3d at 424 (the language used by the General Assembly revealed no intent to limit the application of the culpable mental state only to one element of the offense). Given these provisions, then, we conclude that the General Assembly did not intend to limit the application of the mens rea of "knowingly" to any particular element.

■ It follows, therefore, that, to violate the statute by making a threat to a person who has the duty to report that threat to the judge, an individual making a threat must know that that person is under such a duty. If such knowledge were not required, the crime of retaliation against a judge could be committed by an individual who has no anticipation that the judge would be made aware of the threat. Nothing on the face of the statute supports such an interpretation. Indeed, the specific requirement in section 18–8–615(1)(b) that the individual "knowingly make[ ] the credible threat" is entirely inconsistent with the conclusion that the individual need not know of the professional's duty to inform the judge.

We conclude, then, that to commit the crime of retaliation against a judge under section 18–8–615(1)(b)(II)(B), an individual must know when making the threat that the person to whom the threat is communicated is under a duty to report it to the judge.

### III. Sufficiency of the Evidence

In determining whether the evidence in the record is legally sufficient to support Berry's conviction, we must construe that evidence in the light most favorable to the prosecution. We may reverse his conviction only if we conclude that no rational juror could have found beyond a reasonable doubt that Berry was guilty of the crime charged. *People v. Lehnert,* 163 P.3d 1111, 1115 (Colo. 2007); *People v. McNeely,* 222 P.3d 370, 373 (Colo.App.2009).

While this standard is an exceedingly difficult one to meet, we must conclude that there was simply no evidence here upon which any rational juror could have found that when Berry made his statements to the evaluator, he knew that she was under a duty to report those statements to the judge.

■ The evidence was that Berry came to the hospital to obtain some psychological help with his emotional problems, which had resulted in his ideating about killing several people who had been associated with the prior court proceedings, including the judge. However, there is no evidence that he had ever before consulted with a mental health professional or that he had any prior knowledge of the reporting duty that the Colorado statutes place upon such professionals.

Further, the mental health professional with whom he spoke was specific in testifying that, while she generally gives prior warnings to her private patients about her duty to report any threats, she told Berry of her requirement to report only after he had made the statements to her.

Thus, the prosecution did not present sufficient evidence from which any rational juror could have found that Berry was aware, before he made any statement to the evaluator, that she was required to report his statements to the judge. And, given this lack of evidence, Berry's conviction cannot stand.

### IV. Conclusion

The judgment of conviction is reversed.

Judge FURMAN and Judge RICHMAN concur.